## In re BLOEMECKE.

(District Court, D. New Jersey. April 13, 1920.)

Bankruptcy ⬤═391(3)—Claim held based on misappropriation in "fiduciary capacity," so that proceedings in state court will not be stayed.

Where a bankrupt organized a corporation and induced stockholders to consent to his purchase of lands on behalf of the corporation, whereupon the bankrupt made a secret profit, representing that he paid a greater price than he actually did, and on suit in state courts of a stockholder decree was rendered against the bankrupt, the claim furnishing the basis of such decree is one resting on misappropriation by the bankrupt in a fiduciary capacity; for money is received in a "fiduciary capacity" when it does not become the absolute property of the one receiving it, but is received for a particular purpose, in which other persons than the one receiving it are interested, and hence, as the funds were received by the bankrupt in a fiduciary capacity, a discharge would not, under Bankruptcy Act, § 17a(4) (Comp. St. § 9601) release the claim or decree, so section 11 (section 9595) furnishes no ground for staying proceedings in the state court.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fiduciary Capacity or Character.]

---

In Bankruptcy. In the matter of Henry J. Bloemecke, bankrupt. Petition by the bankrupt to restrain Charles L. Applegate from further proceedings to enforce a decree carrying a money judgment against the bankrupt until the question of discharge should be determined. Petition dismissed.

Bilder & Bilder, of Newark, N. J., for bankrupt.
Thomas A. Davis, of Orange, N. J., opposed.

LYNCH, District Judge. Charles L. Applegate, a stockholder of the Realty Corporation of North America, filed a bill in the court of Chancery of New Jersey against Henry J. Bloemecke, president of that company, seeking an accounting for certain moneys which, it was alleged, Bloemecke had misappropriated.

The bill alleged that Applegate, as well as a number of others, paid over to Bloemecke various sums of money for corporate purposes; that while Bloemecke had this money in his possession he requested the board of directors to authorize him to use certain specified sums of it in the purchase of certain properties, claiming that the company would save money if he alone were permitted to conduct the negotiations for and acquire the property in his individual name rather than in the name of the company; that such authority was given him by the board of directors; that Bloemecke concluded negotiations for the properties and reported to the board the amounts expended therefor in behalf of the company, whereupon the board of directors duly approved the transactions so reported by him; that, subsequent to the acquiring of the property by the company, the complainant learned that Bloemecke had actually paid less for the properties procured than the amounts which he reported he had paid therefor, and had appropriated the difference to his own individual use, which difference, or unexpended balance, amounted in all to the sum of $18,250.

Bloemecke filed an answer, denying Applegate's allegations, and insisting that the complainant was not entitled to the relief prayed for. The matter came on for hearing before Vice Chancellor Stevens on April 3, 1918, whose opinion follows:

"This is a suit by complainant, suing on behalf of the Realty Corporation of North America, to recover from Henry J. Bloemecke moneys of the company alleged to have been applied by him to his own use. In June, 1910, Mr. Bloemecke and a Mr. Bradley conceived the idea of forming a land company, whose stockholders should be local superintendents of the Metropolitan Life Insurance Company. Bloemecke, besides being one of these superintendents, was a real estate operator in Newark. He attended to the organization of the realty company, he obtained subscriptions to its capital stock, and he handled the money. The scheme was to buy land in Montclair for the purpose of developing it. There were to be 10 stockholders, each of whom was to subscribe $5,000. The corporation was organized in September, 1910, and three tracts of land, heavily mortgaged, were actually purchased for it by Bloemecke at what seem to have been excessive prices. The project was a failure and in 1914 practically abandoned. The land was sold under foreclosure.

The bill alleges that in the case of each of the three purchases Bloemecke represented that he was paying for the land more than he actually paid and that he appropriated the difference. In the case of the Orange road tract his profit is said to have been $1,250. He charged the company on its books $7,750. He actually paid the vendor $6,500. He accounts for the difference by

saying that he told his fellow stockholders that he would let the company have the property for $30 per foot. The testifying stockholders say that he agreed to turn it over to the company for what it cost. The book entries make it more than probable that it was bought with the stockholders' money just before the corporation was organized, and their version of what he said on the subject of turning it over is more probable than his.

"The profit in the case of the Lockwood tract is said to have been $2,000. It is undisputed that the property cost $52,500, and that Bloemecke charged the company $54,500. His justification is that his brother Charles, who became the company's manager, had himself secured an option and then a contract of purchase, neither of which he produces, and that he (Charles) sold the interest thus acquired for $2,000. The only contract in evidence is that which is made with the defendant Henry Bloemecke. His brother does not testify, although his testimony was easily obtainable, and the documents, including the company's books, kept by the defendant himself, as far as put in evidence, do not bear out Henry's statements. As far as they go, they throw doubt over them. Bloemecke, as president of the company and as the custodian of the fund intrusted to him, is bound satisfactorily to account for what he did with the stockholders' money. This he does not do. It is hard to understand why Charles should have received $2,000 for an interest thus acquired, an interest that cost him nothing. Mr. Baldwin, who acted for the vendor, thinks there was but one written agreement—the agreement in evidence. Charles, it is true, as the company's agent, conducted the negotiation; but it is more than probable that from the beginning it was understood that he was acquiring it for the company.

"In the case of the Lindenmeyer property, the amount alleged to have been wrongfully appropriated is $15,000. The price actually paid to the executors of the Lindenmeyer estate was $201,500. The company is charged $216,500. Bloemecke accounts for the difference by saying that he paid it to Henry Lindenmeyer because that gentleman informed him (I quote his words) 'that there were quite a number of heirs concerned in this property; that there were a certain number of trustees, and he said that he could influence—that is, the trustees were in a position to influence—the heirs, and * * * that, if I paid him $15,000, why he would endeavor to negotiate the property at a smaller price with the trustees and the heirs.' This is a euphemistic way of saying that Mr. Lindenmeyer wanted a bribe for using his influence to persuade his co-trustees and his cestuis que trust to accept less than they would otherwise have done. There were five executors in all. The only one sworn was Mr. Sonntag. He testifies that Henry Lindenmeyer died on December 1, 1910, 11 days after the deed was acknowledged by the executors and on the very day it was delivered. He says, further, that he had charge of the negotiations, that Lindenmeyer had very little to do with them, that all the executors made the agreement together, and that he knew absolutely nothing of the alleged payment.

"When Bloemecke, with a view of discharging himself from liability for this large sum, accuses a man of having betrayed his trust, a man whose lips are sealed by death, he ought to be able, at least, to point to some indications of the truth of his story. He says that he saw Mr. Sonntag in the beginning, and that Mr. Sonntag turned him over to Mr. Lindenmeyer, who seemed, as he says, to be the man in charge. In this he is contradicted by Mr. Sonntag. There is nothing to indicate that Henry Lindenmeyer was in the dominating position, or that, on the brink of the grave, he was willing, for a consideration, to commit a wrongful act. He says further that he paid the money in bills of the denomination of $1,000. Neither of his bank accounts shows the withdrawal of such a sum about the time of the purchase. It is not likely that he had any such sum elsewhere, and he does not pretend that he had.

"He testifies that while the negotiations were progressing he told his codirectors he was making 'an inside deal,' but not the particulars of it, because, he says, 'those things lead to trouble with the man that you make the deal with.' All the stockholders who are sworn deny that he made any statement of the kind. They say that when, two or three years later, it was discovered that he had charged more than the price paid, he refused to answer their inquiries until after he had consulted counsel. In view of these considerations,

I am unwilling to find that Bloemecke has sufficiently accounted for the money; and, even if the evidence had been stronger, I doubt whether the company could, if the board or directors knew nothing of the transaction, be deemed to have authorized the payment. A general authority to purchase would hardly include a general authority to bribe.

"It is argued that the suit cannot be maintained, for the reason that complainant has failed to show a refusal, actual or presumptive, by the board of directors to prosecute. The evidence is that after the misappropriations were discovered there was a meeting of the directors, and it was decided that as they were all employés of the Metropolitan Company it would, in the words of one of the witnesses, be better to get the permission of that company to bring suit, for fear that, if it was not approved, some people would lose their positions. Permission was sought, and, if not explicitly refused, it was at least not granted. Subsequently, in October, 1916, the complainant addressed a formal communication to the vice president of the realty company (the president being Bloemecke), requesting that action be taken. To this there was no response. The minutes show that the last recorded meeting was held in February, 1914. In Siegman v. Maloney, 20 Dick. (65 N. J. Eq.) 372, 54 Atl. 405, the Chief Justice thus states the rule: 'The right of a stockholder to prosecute a suit on behalf of the corporation can only be maintained by showing a refusal, actual or presumptive, by the board of directors to do so; and where there has been no actual refusal the burden is on the stockholders to show the existence of such a state of facts as justifies the conclusion that an application to the board to prosecute would be futile.' I think the complainant has shown a sufficient refusal. He urged the board to take action and they did not.

"It is argued, further, that the suit is barred by laches. The suit is for money had and received by Bloemecke and fraudulently misappropriated. To such an action the statute of limitations, and not the doctrine of laches, applies."

Thereafter, in July, 1918, the Vice Chancellor ordered and decreed that Bloemecke pay to the Realty Corporation of North America the sum of $18,250, besides interest, $500 counsel fee, and $35 costs. On September 5, 1918, Bloemecke filed a voluntary petition in bankruptcy in this court, setting out in his schedules this claim or judgment of the realty corporation against him, which then totaled $27,213.59.

In May, 1919, Applegate filed a petition in the Court of Chancery, praying for an order directing that a capias ad satisfaciendum be issued against the body of Bloemecke, the hearing of which petition was fixed for June 17, 1919. On June 9, 1919, Bloemecke petitioned this court for an order enjoining and restraining Applegate from taking any further proceedings therein until the question of his discharge should be determined; it being alleged by him that the claim of Applegate was not "founded upon fraud or false representation and is a claim from which a discharge in bankruptcy would be a release."

This petition was filed under the provisions of section 11 of the Bankruptcy Act (Comp. St. § 9595), which reads as follows:

"A suit which is founded upon a claim from which a discharge would be a release, and which is pending against a person at the time of the filing of a petition against him, shall be stayed until after an adjudication or the dismissal of the petition; if such person is adjudged a bankrupt, such action may be further stayed until twelve months after the date of such adjudication, or, if within that time such person applies for a discharge, then until the question of such discharge is determined."

On June 9, 1919, Judge Haight ordered that Applegate show cause why Bloemecke's petition for restraint should not be granted, staying, pending the hearing thereof, further proceedings in the Court of

Chancery between Applegate and Bloemecke. It is this rule to show cause which is now before me for determination. Bloemecke has not yet received his discharge.

In the case of In re Dowie (D. C.) 202 Fed. 816, District Judge Holt, in the Southern District of New York, held that a judgment on a debt which is not dischargeable should not be stayed pending bankruptcy proceedings. Applegate answers that the debt of the bankrupt is not dischargeable because—

"It was created by fraud, embezzlement, misappropriation, and defalcation of the bankrupt acting as an officer of said corporation, to wit, as its president, and while acting in a fiduciary capacity, to wit, while he was expending money of the corporation."

Bloemecke insists that the judgment is of such a character and nature that a discharge in bankruptcy would be a full release. He argues, first, that in purchasing the lands subsequently acquired by the Realty Corporation of North America he did not act as an officer of that company; and, second, that in purchasing said lands he did not act in a fiduciary capacity with relation to said realty corporation. His argument is that he acted in the capacity of an agent. So the issue to be determined is whether the claim, upon which the decree is founded, was created by Bloemecke's fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity.

Bloemecke and another person (one Bradley) planned the formation of this realty company. He attended to its organization, obtained subscriptions for its stock, became a stockholder, a director, and its president, and deposited its money in his personal bank account in New York City. While its president and in the personal possession of its funds, he sought authority from the board of directors of the company to acquire for it in his individual name some property. The board voted authority to him to expend the amounts of money which he stated were necessary. The moneys so requested and obtained were more than were actually necessary to acquire the desired properties, so, instead of so reporting, he retained the differences between the amounts received and paid out for his individual use. Vice Chancellor Stevens concluded that the "suit is for money had and received by Bloemecke and fraudulently misappropriated."

There being no doubt of a misappropriation, was it committed while Bloemecke was acting as an officer or in a fiduciary capacity? A very good definition of "fiduciary capacity" is that of Vice Chancellor Pitney in Haggerty v. Badkin, 72 N. J. Eq. 476, 66 Atl. 421, viz.:

"Money is received or detained by one from another in a fiduciary capacity when, in the mind of the person handing the money to the other, as such mind is known to that other, it does not become the absolute money and property of that other to do with as he chooses as his own money, but is received by him for a particular purpose in which a person or persons other than the person receiving it is or are interested. If two persons are in partnership, and one is acting as cashier or financial manager, and the other pays money to his partner to be used in partnership business, the money so paid is received in a fiduciary capacity. The receiver holds it in trust for the partnership and for the benefit of the partners in proportion to their several interests, and neither partner has the right to appropriate one dollar of it to his individual use

without the consent, express or implied, of the other party. &ast; &ast; &ast; Now, it seems to me, this sort of fiduciary capacity is clearly within the language of the act."

Without the knowledge or consent of any of the stockholders or directors of the realty corporation Bloemecke committed what has properly been declared to be a misappropriation; and when Applegate learned of it he brought the chancery action, and Vice Chancellor Stevens held that—

"Bloemecke, as president of the company and as the custodian of the fund intrusted to him, is bound satisfactorily to account for what he did with the stockholders' money."

In the case of Haggerty v. Badkin, supra, Vice Chancellor Pitney reviews many of the cases relied upon by Bloemecke, including the following: Chapman v. Forsyth, 2 How. 202, 11 L. Ed. 236; Hennequin v. Clews, 111 U. S. 676, 4 Sup. Ct. 576, 28 L. Ed. 565; Crawford v. Burke, 195 U. S. 176, 25 Sup. Ct. 9, 49 L. Ed. 147; Noble v. Hammond, 129 U. S. 65, 9 Sup. Ct. 235, 32 L. Ed. 621—and points out that a "distinction in the proper remedies is adverted to, and in a measure relied upon, in determining whether the debt is or is not barred by the discharge"; that is to say, if an action at law could be maintained against the person misappropriating, as could be done in the case of mercantile transactions between factor and principal, the debt would be dischargeable; but, as is pointed out by counsel for Applegate, Bloemecke could not be proceeded against at law because he, as president and custodian of the company's funds, could establish that the money was handled by him in corporation business.

In the decree of Vice Chancellor Stevens we find the following expressions:

"That he made such purchases of said lands as trustee for the said Realty Corporation of North America and its stockholders," and "the sums of money remaining in his hands as trustee for the said Realty Corporation," etc.

In the case of Upshur v. Briscoe, 138 U. S. at page 378, 11 Sup. Ct. 314, 34 L. Ed. 931, we find the following:

"The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created."

Can it be seriously argued that Bloemecke, president and custodian of the company's moneys, was not already a fiduciary when the debt was created; that is to say, when he sought and obtained authority to use various specified amounts for particular purposes? And in the case of In re Gulick (D. C.) 186 Fed. 350 (1911), it is held that the funds coming to officers of corporations as such are held by them in a "fiduciary capacity" under section 17 (4). I quote from the syllabus:

"Officers of a corporation, where they get control, with an attendant fiduciary obligation, of property of the corporation, are 'officers' within Bankruptcy Act July 1, 1898, c. 541, § 17, subd. 4, 30 Stat. 551, &ast; &ast; &ast; exempting from discharge debts created by misappropriation or defalcation while acting as an 'officer,' so that a continuance of a suit in a state court against corporate officers for the value of corporate property misappropriated by them will not be stayed on the application of the officers who had been adjudicated bankrupt."

I quote a few lines from Judge Hand's opinion in the Gulick Case, supra, with which I fully agree:

"Certainly it is undesirable to look too scrupulously for exceptions in the natural meaning of the clause. There is no reason to strain the words, so as to protect those who avowedly are guilty of fraud, embezzlement, misappropriation, or defalcation."

My conclusion is that Bloemecke misappropriated moneys of the company while acting in a fiduciary capacity, within the meaning of section 17a (4) of the Bankruptcy Act (Comp. St. § 9601), and that therefore the "claim" upon which Applegate's suit is founded, not being one from which a discharge would be a release, section 11 of the Bankruptcy Act, providing for a stay, does not apply.

The petition will be dismissed.